IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COX ENTERPRISES, INC. and COX RADIO, Inc., | |
| **Plaintiffs,** | CIVIL ACTION FILE |
| v. | NO. 1:20-CV-415-MHC |
| HISCOX INSURANCE COMPANY, INC., | |
| **Defendant.** | |

## ORDER

This case comes before the Court on Defendant Hiscox Insurance Company,

Inc. ("Hiscox")'s Rule 12(b)(6) Motion to Dismiss [Doc. 29].

## I.    BACKGROUND[1]

This case involves Hiscox's denial of multimedia liability insurance

coverage to Cox Enterprises, Inc. ("CEI") and Cox Radio, Inc. ("Cox Radio")

(collectively "Cox").  Second Am. Compl. ¶ 1.

---

[1] Because this case is before the Court on a motion to dismiss, the facts are presented as alleged in Plaintiffs' Second Amended Complaint ("Second Am. Compl.") [Doc. 22].  See Silberman v. Miami Dade Transit, 927 F.3d 1123, 1128 (11th Cir. 2019) (citation omitted).

## A.     Insurance Policy Coverage

Hiscox sold CEI US TNT Multimedia Liability Policy No. US UAA

261.9952.11 (the "Policy") [Doc. 29-2 at 42-51],[2] with a policy period of

December 1, 2011, through December 1, 2012.  Id. ¶ 14.  The Policy's basic

insuring clause states:

> **We** will indemnify **you** for **defense costs** and **damages** incurred as a
> result of a **claim** that falls within WHAT HAS TO GO WRONG
> (Section II) under this policy, WHAT WE WILL PAY (Section IV)
> under this policy, and HOW MUCH WE WILL PAY (Section V) under
> this policy.

Id. ¶ 17 (citing Policy § I).  The insured has coverage under the Policy when

> [t]he performance of **media activities** by **you** or anyone on **your** behalf
> during the policy period results in a **claim** against **you** that arises from
> **covered media** or **advertising**, regardless of when such **claim** is made
> or where such **claim** is brought, and including but not limited to any
> **claim** for actual or alleged:

---

[2] In ruling upon a motion to dismiss, the district court may consider an extrinsic
document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not
challenged."  SFM Holdings, Ltd. v. Banc of Am. Sec., LLC, 600 F.3d 1334, 1337
(11th Cir. 2010) (citing Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005)); see
also Harris v. Ivex Corp., 182 F.3d 799, 802 n.2 (11th Cir. 1999) ("[A] document
central to the complaint that the defense appends to its motion to dismiss is also
properly considered, provided that its contents are not in dispute.").  The Policy,
attached to Hiscox's motion to dismiss, is central to the Plaintiffs' claim because it
is the controlling document of the insurance policy in dispute.  The parties rely on
and do not dispute the Policy's contents.  See, e.g., Mem. in Supp. of Def. Hiscox
Ins. Co., Inc.'s Rule 12(b)(6) Mot. to Dismiss ("Def.'s Mem.") [Doc. 29-1] at 8;
Pls. Cox Enters., Inc. and Cox Radio, Inc.'s Mem. of Law in Opp'n to Def. Hiscox
Ins. Co., Inc.'s Rule 12(b)(6) Mot. to Dismiss ("Pls.' Opp'n") [Doc. 32] at 46.

\*\*\*

e.    infliction of emotional distress or outrage;

f.    breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's picture, name, voice, or identify for commercial gain, or unauthorized interception or recording of sound or date in violation of a civil anti-wiretap statute;

\*\*\*

l.    negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a) - (m); and/or

m.    any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from **your media content** disseminated in **covered media** or **advertising**.

Id. ¶ 18 (citing Policy § II; Policy Decl. [Doc. 29-2 at 6-39], Endorsement 1). The

Policy defines "media activities" as:

1.    the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;

2.    any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content**;

3.    any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;

4.    any digital, online, or electronic dissemination of **media content**;

3

> 5.    the release, distribution, licensing, sale, lease, or exhibition of **media content**;
>
> regardless of the mode or method of communication of such **media content**.

Id. ¶ 19 (citing Policy § VIII).  The Policy defines "media content" as:

> the substance of any communication of any kind whatsoever within **covered media** or **advertising**, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, advertisements, artistic expression, or visual or graphical materials.

Id. ¶ 20 (citing Policy § VIII).

The parties disagree whether Cox performed "media activities" that resulted in a claim against Cox arising from covered media or advertising.  See id. ¶¶ 81- 83; Def.'s Mem. at 1.  The Policy defines "covered media" as "the specific media described as 'covered media' in the Declarations."  Policy § VIII.  The Policy Declaration states that "covered media" means

> [a]ll publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via websites owned or operated by you.

Second Am. Compl. ¶ 21 (citing Policy Decl. § III).

4

The Policy Declaration defines "advertising" in two different ways.  In Endorsement 1, advertising is defined as "advertising, marketing, publicity, or promotion of **the insured's**, **existing subsidiary's**, or **acquired entity's** own goods and services and of the goods and services of their clients."  Second Am. Compl. ¶ 22; Policy Decl., Endorsement 1 (deleting and replacing the definition of "advertising" in the Policy).  In Endorsement 6, "advertising" is defined as "advertising, publicity, or promotion in or of **covered media** regardless of the form of such 'advertising' including 'advertising' via any social media platforms (including but not limited to Facebook, Twitter, LinkedIn or MySpace)."  Policy Decl., Endorsement 6 (deleting and replacing the definition of "advertising" in the Policy).

## B.    Factual Allegations

In 2016, Cox Radio, an employee of Cox Radio, Michael Calta ("Calta"), and a former employee of Cox Radio, Matthew Loyd ("Loyd"), were all named as defendants in a lawsuit filed in Florida state court by Terry Bollea, a/k/a Hulk Hogan ("Bollea") (the "Bollea Action").  Second Am. Compl. ¶¶ 2, 27.  The Bollea Action asserted nine causes of action against Cox Radio[3] related to an alleged

---

[3] The causes of action were as follows: invasion of privacy, invasion of privacy by public disclosure of private facts, invasion of privacy by intrusion, intentional infliction of emotional distress, intentional interference with contractual relations,

conspiracy among Cox Radio, Calta, and Loyd to disseminate videotaped recordings (and excerpts and images thereof) of sexual encounters between Bollea and the then-wife of a Tampa radio personality.  Id. ¶ 27.

Bollea alleged that Cox Radio, Calta, and Loyd "repeatedly victimized Bollea by obtaining, using, disclosing, dissemination, and exploiting surreptitiously recorded and illegally obtained video footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the 'Footage')."  Id. ¶ 28.  Bollea alleged that Cox Radio, Calta, and Loyd conspired (1) to leak and sell information about and excerpts from the Footage to TMZ and TheDirty.com in March-April 2012, and (2) to anonymously send a DVD containing some of the Footage to the then-editor of Gawker.com in September-October 2012.  Id. ¶¶ 29-30.  TMZ published a story about the Footage, TheDirty published screenshots from and stories about the Footage, and Gawker posted a video showing excerpts of the Footage.  Id.  Further, in July 2015, the National Enquirer published a story quoting excerpts from the Footage, which it described as coming from a court-protected, confidential transcript that contained racist comments made by Bollea.  Id. ¶ 31.  Bollea alleged that Cox Radio, Calta,

---

violation of Florida's Secure Communications Act, civil conspiracy, negligent retention, and negligence.  Second Am. Compl. ¶ 35.

and Loyd's actions substantially contributed to the <u>National Enquirer</u>'s publication. <u>Id</u>.  Calta was employed by Cox during the entire relevant period, and Loyd was employed by Cox when the Footage was sent to Gawker.  <u>Id</u>. ¶¶ 32-33.  Bollea alleged that both employees were acting within the course and scope of their employment with Cox.  <u>Id.</u>

On May 6, 2016, CEI provided notice to Hiscox of a claim for insurance coverage arising from the Bollea Action (the "Claim").  <u>Id</u>. ¶¶ 2, 50.  On June 3, 2016, Hiscox issued a reservation-of-rights letter wherein it acknowledged that:

(1) the Claim arose "out of the dissemination of certain videos of Terry Bollea (a/k/a Hulk Hogan) engaged in sexual activity and making certain racist statements";

(2) Bollea alleged that Cox Radio disseminated the Footage through its "disclosure of the videos" to both TMZ.com and Gawker.com "for inclusion in their programming";

(3) Bollea alleged that Calta and Loyd were "acting within the scope of their employment with Cox and with the knowledge of their superiors at Cox";

(4) the claims in the Bollea Action may have arisen from the creation or dissemination of "advertising," as defined in the Policy; and

(5) the Policy "is a duty to pay policy" and consented to Cox Radio's choice

of defense counsel and promised to pay defense costs once the $500,000.00

retention was exhausted.[4]

Id. ¶¶ 51-55.

Before Cox filed this case, the parties had several communications regarding

coverage for defense costs in the Bollea Action.  Between July 11, 2017, and

August 22, 2017, Ms. Greenhill, a CEI employee, and Ms. Bodden, a Hiscox

employee, exchanged emails regarding reimbursement of defense costs.  Id.

¶¶ 56-60.  On July 20, 2017, Ms. Bodden wrote that Hiscox "will be reimbursing

defense costs" and "will need to look at allocation for non[-]covered matters."  Id.

¶ 57.  Then on August 22, 2017, Ms. Bodden wrote that there was "no issue with

allocation at this point."  Id. ¶ 59.  On March 19, 2018, Hiscox sent a letter

acknowledging that Cox has exhausted the retention and found that it was

"appropriate to discuss allocation of further defense costs."  Id. ¶ 61.  On April 9,

2018, Cox responded, stating that it "d[id] not agree that this claim presents a

situation of covered and noncovered matters" and thus did not agree with Hiscox's

---

[4] The Policy has a $15,000,000.00 Single Aggregate Limit, inclusive of defense
costs and damages, and a $500,000.00 retention for each claim inclusive of defense
costs and damages.  Policy Decl. § III.

views on allocation.  Id. ¶ 62.  Further communication ensued between the parties

throughout April 2018, April 2019, October 2019, and December 2019, with Cox

repeating its position that all claims should be covered and Hiscox repeating its

position that the parties should discuss an appropriate allocation of defense costs.

Id. ¶¶ 63-67.

Cox and Hiscox agreed to hold a mediation session relating to allocation

issues in advance of a mediation scheduled for January 27, 2020, in the Bollea

Action.  Id. ¶¶ 36, 72.  On January 21, 2020, before Cox and Hiscox were

scheduled to mediate, Hiscox's new outside counsel sent Cox's outside counsel a

letter in which Hiscox, for the first time, denied coverage for the Claim and stated

that the letter "shall replace and supersede all prior communications."  Id. ¶ 74.

Hiscox denied coverage on two grounds: (1) while "the Bollea Footage was . . .

disseminated by Loyd and/or through Calta," the operative complaint in the Bollea

Action "contains **NO** allegations that Cox ever acquired, collected, compiled,

disseminated, or in any way publicly disclosed the Bollea Footage"; and (2) "as the

dissemination of the Bollea Footage did not promote Cox's interests or programs,

any **media activities** allegedly by Cox or on behalf of Cox did not arise from

**covered media** or **advertising** as defined by the Policy."  Id. ¶¶ 76-77.  Cox

contends that both grounds for denial are frivolous and at odds with the explicit

allegations in the operative complaint in the Bollea Action and the clear language of the Policy.  Id. ¶ 79.

On March 19, 2020, Cox and Bollea entered into a settlement agreement in the Bollea Action where Cox agreed to make a payment to Bollea in exchange for a release of his claims against Cox Radio, Calta, and Loyd.  Id. ¶¶ 37, 39-40.  Cox made the settlement payment to Bollea on March 20, 2020, and Bollea has released all claims against Cox Radio, Calta, and Loyd.  Id. ¶¶ 41, 43.  Hiscox has not paid any of the costs incurred in defending Cox Radio in the Bollea Action.  Id. ¶ 68. Cox's Second Amended Complaint asserts claims against Hiscox for (1) breach of contract based upon Hiscox's denial of coverage and refusal to indemnify Cox for its settlement payment in the Bollea Action and its defense costs once the Policy's $500,000.00 retainer was exhausted, and (2) bad faith denial of coverage and failure to indemnify under O.C.G.A. § 33-4-6.  Id. ¶¶ 85-95.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007).  The Supreme Court has explained this

standard as follows:

> A claim has facial plausibility when the plaintiff pleads factual content
> that allows the court to draw the reasonable inference that the defendant
> is liable for the misconduct alleged.  The plausibility standard is not
> akin to a "probability requirement," but it asks for more than a sheer
> possibility that a defendant has acted unlawfully.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citation omitted).  Thus, a

claim will survive a motion to dismiss only if the factual allegations in the pleading

are "enough to raise a right to relief above the speculative level."  Twombly, 550

U.S. at 555.

At the motion to dismiss stage, the court accepts all well-pleaded facts in the

plaintiff's complaint as true, as well as all reasonable inferences drawn from those

facts.  McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004); Lotierzo v.

Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  Not only

must the court accept the well-pleaded allegations as true, but these allegations

must also be construed in the light most favorable to the pleader.  Powell v.

Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011).  However, the court need not

accept legal conclusions, nor must it accept as true legal conclusions couched as

factual allegations.  Iqbal, 556 U.S. at 678.  Thus, evaluation of a motion to dismiss

requires the court to assume the veracity of well-pleaded factual allegations and

"determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.

## III.   DISCUSSION

### A.   Breach of Contract Claim

Hiscox contends that the Second Amended Complaint fails to state a claim

upon which relief can be granted because it contains no allegations that bring the

Claim within the coverage provided by the Policy.  Def.'s Mem. at 2.  Specifically,

Hiscox contends that there are no allegations that the Claim arises from media

content produced or disseminated by Cox Radio, or advertising of Cox Radio's

own products or covered media.  Id. at 1-2.  Cox contends that the allegations in

the Second Amended Complaint show that the Claim arose from both covered

media and advertising as defined by the Policy.  Pls.' Opp'n at 11.

In Georgia, ordinary rules of contract interpretation govern the interpretation

of insurance policies.  Ace Am. Ins. Co. v. Wattles Co., 930 F.3d 1240, 1252 (11th

Cir. 2019) (citation omitted); Collier v. State Farm Mut. Ins. Co., 249 Ga. App.

865, 866 (2001); see also Lambert v. Alfa Gen. Ins., 291 Ga. App. 57, 58 (2008)

(citation omitted) ("Under Georgia law, contracts of insurance are interpreted by

ordinary rules of contract construction. . . . Where the terms are clear and

unambiguous, and capable of only one reasonable interpretation, the court is to

look at the contract alone to ascertain the parties' intent."). "The elements of a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." Bates v. JPMorgan Chase Bank, NA, 768 F.3d 1126, 1130 (11th Cir. 2014) (internal quotation marks omitted) (quoting Norton v. Budget Rent A Car Sys., Inc., 307 Ga. App. 501, 502 (2010)).

"The construction of a contract is a question of law for the court." Global Ship Sys., LLC v. Cont'l Cas. Co., 292 Ga. App. 214, 215 (2008) (citing O.C.G.A. § 13-2-1). "We follow a three-step process in construing a contract, first determining if the contract language is clear and unambiguous. When a contract contains no ambiguity, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning." Id. (internal quotation marks and citation omitted); see also Bd. of Comm'rs of Crisp Cty. v. City Comm'rs of City of Cordele, 315 Ga. App. 696, 69 (2012) (citations omitted) ("The first step if to decide whether the language of the contract is clear and unambiguous. If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning.").

The Policy covers "[t]he performance of **media activities** by **you** or anyone on **your** behalf during the policy period results in a **claim** against **you** that arises

13

from **covered media** or **advertising**, regardless of when such **claim** is made or where such **claim** is brought . . . ."  Policy § II.  Hiscox contends that the Policy "only provides coverage for media activities <u>directly arising from Cox's own media programming</u> or advertising promoting Cox's own programming."  Def.'s Mem. at 23 (emphasis added); <u>see also</u> <u>id.</u> at 9 ("[A] claim must arise from or be in promotion of Cox's own multimedia products to be covered").  Hiscox contends that the Policy "contains no language limiting 'media activities' to activities directly arising from Cox's own programming."  Pl.'s Opp'n at 12.

The Policy defines "media activities" to include "any . . . dissemination . . . of **media content**" and "any digital, online, or electronic dissemination of **media content**."  Policy § VIII.

> "Media content" the substance of any communication of any kind whatsoever within **covered media** or **advertising**, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, advertisements, artistic expression, or visual graphical materials.

<u>Id.</u>  "Covered media" means

> [a]ll <u>publications, programming and other communications</u> (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) <u>produced or disseminated by you</u>; including <u>but not limited to</u> content of personal appearances by you and all content disseminated via websites owned or operated by you.

Id.; Policy Decl. § III (emphasis added).

Under the plain language of the Policy, both communications produced by Cox and communications disseminated by Cox are included in the definition of "covered media."  Policy § VIII; Policy Decl. § III.  Hiscox acknowledges this, noting that covered media is defined as "publications, programming, or other communication that Cox, itself, produced or disseminated."  Def.'s Mem. at 9 (emphasis added) (citing Policy Decl. § III).  Yet Hiscox insists that "only communications directly related to Cox's own multimedia products or programming are covered by the Policy."  Mem. in Supp. of Rule 12(b)(6) Mot. to Dismiss ("Def.'s Reply") [Doc. 36] at 3.  However, the Policy does not limit covered media to those communications produced and disseminated by Cox.  See Policy Decl. § III.

Hiscox focuses on an exception contained within the definition of covered media, which excludes "ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products."  Def.'s Mem. at 9-10 (citing Policy Decl. § III).  This limitation merely clarifies that "ordinary business communications" directly related to Cox's own multimedia products are covered media.  Conversely, those "ordinary business communications" not related to Cox's own multimedia products are not covered

media.  Policy Decl. § III.  However, nothing in the definition of covered media

limits the publications, programming, and communications—other than "ordinary

business communications"—to those arising from Cox's own multimedia products.

See id.  Under the Policy, "all . . . other communications" "disseminated by" Cox

that are not "ordinary business communications" are covered media, and the

substance of those communications is media content.  See id.; Policy § VIII.

    In its reply brief, Hiscox contends for the first time that if Calta and Loyd

acted within the course and scope of their duties as Cox employees, then logically

leaking the Footage was an ordinary business communication.  See Def.'s Reply

at 4.  Hiscox does not explain how it arrived at this conclusion.  Covered media

includes "all publications, programming and other communications (but not

including ordinary business communications not directly related to the preparation,

dissemination or promotion of your multimedia products) produced or

disseminated by" Cox.  Policy Decl. § III.  The Footage falls under the umbrella of

"other communications."  Hiscox appears to imply that "other communications"

includes only "ordinary business communications."  See Def.'s Reply at 4; see also

Def.'s Mem. at 15-16 (citing the definition of covered media) ("Cox reads out of

the Policy that part of the definition that specifically excludes from coverage

communications not directly related to Cox's own multimedia programming.").  If

16

Hiscox's interpretation was correct, the limiting phrase "ordinary business" would be meaningless surplusage.[5]  A finding that Calta and Loyd acted within the scope and course of their employment does not also necessitate a finding that the Footage was an ordinary business communication.  The Court is not persuaded that leaking or selling a stolen sex tape is an "ordinary business communication."

Hiscox also contends that the alleged media activities were not performed by, and the media content was not disseminated by, Cox.  See Def.'s Mem. at 6-7.  As Hiscox acknowledges, "You and Your" in the Policy is defined to include "any person who was, is or becomes . . . [an] employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such . . . ."  Policy Decl., Endorsement 2.  Hiscox acknowledges that this provision covers employees of Cox Radio, an alleged subsidiary of CEI, the insured.  Def.'s Mem. at 4 (citations omitted).  Yet Hiscox contends that "Cox does not and cannot affirmatively allege that Calta, Loyd, or anyone at Cox Radio was acting within the scope and course of his/her employment at Cox Radio."  Id. at 6-7.

---

[5] Hiscox repeatedly ignores or deemphasizes the limiting phrase "ordinary business" when arguing that the only reasonable construction of the Policy is that claims must arise from Cox's own media products or programming.  See, e.g., Def.'s Reply at 3, 6; Def.'s Mem. at 16.

Hiscox ignores multiple explicit allegations in the Second Amended

Complaint:

> Bollea alleged that "at all relevant times, Calta was acting within the course and scope of his employment by Defendant, Cox Radio, Inc.";

> Bollea alleged that when employed at Cox Radio, "Loyd was acting within the course and scope of his employment by Defendant, Cox Radio";

> Bollea further alleged that "while engaged in the misconduct alleged herein, Calta and Loyd were acting within the course and scope of their employment as 'shock jocks' for Cox, engaged in conduct of the kind they were hired to perform, within the time and space limits of their employment' . . . ."; and

> Bollea expressly alleged that Cox Radio and Calta and Loyd—in the scope and course of their employment at Cox Radio—disseminated the Footage.

Second Am. Compl. ¶¶ 32-34, 48 (alterations accepted).  Whether the evidence in

this case will show that Calta and Loyd were in fact acting within the course and

scope of their employment is another matter.  See generally Def.'s Mem. at 6 n.6.

However, at this stage in the proceedings, accepting Cox's factual allegations in

the Second Amended Complaint as true, Calta and Loyd were acting within the

scope of their employment at Cox Radio.

Hiscox also contends that the Claim does not arise from covered media

because the Footage was not "disseminated" by Cox.  Def.'s Mem. at 12-15.

According to the allegations in the Second Amended Complaint, Bollea alleged that Cox Radio, Calta, and Loyd disseminated the Footage.  Second Am. Compl. ¶ 28.  Specifically, Bollea alleged that Cox Radio, Calta, and Loyd leaked and sold information about and excerpts from the Footage to TMZ and TheDirty in March-April 2012 and anonymously sent a DVD containing some of the Footage to the then-editor of Gawker in September-October 2012.  Id. ¶¶ 29-30. According to Hiscox, however, "disseminate does not mean to leak to a few targeted competitor media sources."  Def.'s Mem. at 14.

Since the Policy does not define "disseminated," the term is "given [its] plain, ordinary, and popular meaning as supplied by a dictionary."  State Farm Fire and Cas. Co. v. Bauman, 313 Ga. App. 771, 774 (2012) (citations omitted); see also Lyons v. Allstate Ins. Co., 996 F. Supp. 2d 1316, 1320 (N.D. Ga. 2014) (citation omitted) ("When Georgia courts construe words that are left undefined in an insurance policy, they often turn to dictionaries . . . .").  The American Heritage Dictionary defines "disseminate" as "[t]o spread abroad; promulgate," and defines "abroad" as "[i]n circulation; at large."  AM. HERITAGE DICTIONARY (5th ed. 2020), https://ahdictionary.com/.  Merriam-Webster likewise defines "disseminate" as "to spread abroad as though sowing seed," and defines "abroad" as "in wide circulation."  Merriam-Webster.com Dictionary, MERRIAM-WEBSTER, https://

19

www.merriam-webster.com/dictionary/ (last visited July 22, 2020).  In addition,

Black's Law Dictionary defines "dissemination" as "[t]he act of spreading,

diffusing, or dispersing; esp., the circulation of defamatory matter."

Dissemination, BLACK'S LAW DICTIONARY (10th ed. 2014).

These definitions indicate that disseminate means spreading or circulating

information, which is what Bollea alleged that Cox Radio, Calta, and Loyd did

with the Footage.  Bollea alleged that Cox Radio, Calta, and Loyd worked in

concert and conspired to leak and sell information about and excerpts from the

Footage to TMZ and TheDirty.  Second Am. Compl. ¶ 29.  Bollea also alleged that

Cox Radio, Calta, and Loyd worked in concert and conspired to anonymously send

a DVD containing some of the Footage to the then-editor of Gawker "while

intending and knowing that [the editor] would post the Footage online."  Id. ¶ 30.

Consequently, assuming the truth of the allegations, Calta and Loyd did not merely

share the Footage with a few people unconnected with other media outlets.

Instead, Calta and Loyd allegedly leaked and sold the Footage to two celebrity

gossip tabloid websites and sent a DVD containing the Footage to the editor of a

third celebrity gossip tabloid website.  Through these actions, Calta and Loyd

spread the Footage and placed it in circulation.  That they gave the Footage to

other media outlets rather than posting it on Cox's websites does not mean that

they did not disseminate the Footage.  <u>See</u> Policy Decl. § III (defining covered media to "[a]ll publications, programming and other communications . . . produced or disseminated by you; including <u>but not limited to</u> content of personal appearances by you and all content disseminated via websites owned or operated by you").

Hiscox contends that disseminate necessarily means "to spread widely," and thus excludes leaking the Footage "to a few targeted competitor media sources." Def.'s Mem. at 13-14.  Even accepting Hiscox's definition, the Court finds that the Second Amended Complaint alleges that Cox Radio, Calta, and Loyd spread the Footage widely.  They leaked, sold, and sent a DVD of the Footage to celebrity gossip tabloid websites.  That these websites took the additional step of publishing the Footage does not mean that Cox Radio, Calta, and Loyd did not disseminate it. Hiscox claims that once the Footage was leaked, Cox Radio, Calta, and Loyd "had zero control over whether the video ever got widely broadcast or disseminated." Def.'s Mem. at 14.  This may be true, but it ignores the fact that Cox Radio, Calta, and Loyd placed the video in circulation by leaking and selling it to other media outlets who were likely to publish it.

Hiscox states that under Cox's interpretation, "any rogue activity or communication" by a Cox employee untethered to Cox's own programming, and

"*any* communication about *anything* to *anyone*" is covered by the Policy.  Def.'s Mem. at 15; Def.'s Reply at 4.  The Court does not agree.  As explained earlier, those ordinary business communications not related to Cox's own multimedia products are not covered media.  See Policy Decl. § III.  In addition, claims must arise out of the course and scope of the employee's duties.  Id. at Endorsement 2.  Finally, only "publications, programming and other communications . . . produced or disseminated by" Cox are covered.  Id. § III.  Thus, not every communication made by a Cox employee is necessarily a communication disseminated by Cox.  Here, however, the Footage that Cox employees allegedly acting within the scope and course of their employment leaked, sold, and sent to three celebrity gossip tabloid websites was "disseminated by" Cox.

Hiscox cites Liberty Mut. Ins. Co. v. Westport Ins. Corp., 664 F. Supp. 2d 587 (D.S.C. 2009), to support its contention that Cox Radio, Calta, and Loyd did not disseminate the Footage.  Liberty Mut. concerned the interpretation of a media and personal liability insurance policy that covered defamation or intentional infliction of emotional distress "committed in the . . . utterance or dissemination of 'matter'. . . ."  Liberty Mut., 664 F. Supp. 2d at 590.  The policy defined "matter" as "words, sounds, or images, made or to be made available to a mass public

audience through the insured's publications, broadcasts, films or other forms of mass media." Id.  The court granted summary judgment to the insurer:

> The policy language in question unambiguously applies to media communication designed to reach a mass audience.  Feldman's behavior, by contrast, involved talking to a few people and writing a letter for distribution to a small group of people involved with the situation.  This was not designed to reach a mass audience within the meaning of the insurance policy . . . .

Id. at 593.  In contrast, Cox Radio, Calta, and Loyd's leaking and selling the Footage to celebrity gossip tabloid websites was undeniably designed to reach a mass audience.

The Court finds that, accepting the factual allegations in the Second Amended Complaint as true, Cox's Claim arose from its employees' dissemination of media content; specifically, Calta and Loyd, acting within the scope and course of their employment, disseminated covered media by leaking, selling, or sending the Footage to three celebrity gossip tabloid websites.[6]  Cox performed media activities during the policy period which resulted in a claim against Cox that arose from covered media.  Thus, the Claim was covered under the Policy, and Cox states a claim for breach of contract because Hiscox has denied coverage.

---

[6] Accordingly, the Court need not determine whether, accepting the factual allegations in the Second Amended Complaint as true, the Claim arose from "advertising."  See generally Policy §§ II, VIII.

**B.**     **Insurer Bad Faith Claim**

Because Cox states a claim for breach of contract, Hiscox's contention that Cox's bad faith claim fails because there is no coverage under the Policy has no merit.  <u>See generally</u> Def.'s Mem. at 22.  However, Hiscox also contends that even if coverage could be found, Hiscox had a good faith basis to deny coverage.  <u>Id.</u> at 22-23.

Georgia law provides:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

O.C.G.A. § 33-4-6(a).  "To prevail on a claim for an insurer's bad faith under O.C.G.A. § 33-4-6, the insured must prove: (1) that the claim is covered under the policy, (2) that a demand for payment was made against the insurer within 60 days prior to filing suit, and (3) that the insurer's failure to pay was motivated by bad faith."  <u>Johnston v. Companion Prop. & Cas. Ins. Co.</u>, 318 F. App'x 861, 867-68 (11th Cir. 2009) (internal quotation marks omitted) (quoting <u>Lavoi Corp. v. Nat'l Fire Ins. of Hartford</u>, 293 Ga. App. 142, 146 (2008)).

"For purposes of [§ O.C.G.A. 33-4-6], bad faith is *any frivolous and unfounded refusal in law or in fact* to pay according to the terms of the policy." Amica Mut. Ins. Co. v. Sanders, 335 Ga. App. 245, 250 (2015) (internal quotation marks and citations omitted).

> Penalties for bad faith are not authorized, however, where the insurance company has <u>any reasonable ground</u> to contest the claim and where there is a disputed question of fact.  Bad faith is shown by evidence that *under the terms of the policy* under which the demand is made and under the facts surrounding the response to that demand, the insurer had <u>no good cause</u> for resisting and delaying payment.

Lawyers Title Ins. Corp. v. Griffin, 302 Ga. App. 726, 731 (2010) (citations omitted) (alterations accepted, underlining added).  "The insured bears the burden of proving bad faith[.]"  Johnston, 318 F. App'x at 868 (internal quotation marks omitted) (quoting Ga. Farm Bureau Mut. Ins. Co. v. Williams, 266 Ga. App. 540, 597 (2004)).  "Ordinarily, the question of good or bad faith is for the jury, but when there is no evidence of unfounded reason for the nonpayment, or if the issue of liability is close, the court should disallow imposition of bad faith penalties." Amica, 335 Ga. App. at 250 (alteration accepted, internal quotation marks and citations omitted, emphasis added).

Based upon the factual allegations in the Second Amended Complaint, the Claim was covered under the Policy.  The Second Amended Complaint also alleges that a demand for payment was made more than 60 days prior to filing the

complaint and that "Hiscox's denial of coverage and failure to pay was motivated

by bad faith."  Second Am. Compl. ¶¶ 92-93.  Hiscox contends that the analysis in

its Memorandum and Reply demonstrate that it had a good faith basis for denying

coverage.  Def.'s Mem. at 23; Def.'s Reply at 14.  At this stage in the proceedings,

the Court looks to the allegations in the complaint to make that determination.  See

Irving v. Owners Ins. Co., No. 1:17-CV-02558-LMM, 2017 WL 8942321, at *2

(N.D. Ga. Sept. 18, 2017) (citing Lawyers Title Ins. Corp. v. Griffin, 691 S.E.2d

633, 637 (Ga. Ct. App. 2010)) ("Plaintiff's [c]omplaint provides no facts

suggesting reasonable grounds for [d]efendant's refusal to pay.  Construing these

facts in the light most favorable to [p]laintiff, the Court may draw the reasonable

inference that the [d]efendant's refusal to pay under the [p]olicy was frivolous and

unfounded. Therefore, [p]laintiff has stated a claim of bad faith that is plausible on

its face.").

According to the factual allegations in the Second Amended Complaint:

(1) in August 2017, Hiscox initially confirmed full defense coverage, Second Am.

Compl. ¶¶ 56-60; (2) in March and April 2018, Hiscox acknowledged that some of

the allegations in the Bollea Action may fall within the scope of coverage and

requested to discuss appropriate allocation of defense costs, id. ¶¶ 61-64; and (3) in

January 2020, days before a scheduled mediation on this issue, Hiscox denied

coverage for the Claim.  Id. ¶¶ 72-75.  On June 3, 2016, Hiscox issued a reservation of rights letter which acknowledged, among other things, (1) that the Claim arose out of the dissemination of the Footage, (2) that Bollea alleged that Cox Radio disseminated the Footage through disclosing it to other news outlets, and (3) that Bollea alleged that Calta and Loyd were acting within the scope of their employment.  Id. ¶¶ 51-53.  In its January 21, 2020, letter denying coverage, Hiscox (1) acknowledged that Loyd and Calta had disseminated the Footage, but contended that the Bollea Action did not allege that Cox did so, and (2) asserted that the dissemination did not arise from covered media since it did not promote Cox's interests or programs.  See id. ¶¶ 74-77.  Now, in this action, Hiscox also contends that Loyd and Calta did not disseminate the Footage.

In finding that Cox states a claim for breach of contract, this Court has rejected Hiscox's interpretation of the Policy and its reasons for denying coverage based on the allegations made in the Second Amended Complaint.  See generally id. ¶¶ 79-83.  The evidence may show that, under the facts surrounding Hiscox's response to Cox's demand to pay, Hiscox had some reasonable ground to contest coverage.  However, construing the factual allegations in the Second Amended Complaint in the light most favorable to Cox, the Court may draw the reasonable inference that Hiscox's refusal to pay under the Policy was frivolous and

unfounded.  Thus, Cox states a claim for bad faith denial of coverage under

O.C.G.A. § 33-4-6.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendant Hiscox

Insurance Company, Inc.'s Rule 12(b)(6) Motion to Dismiss [Doc. 29] is

**DENIED**.

**IT IS SO ORDERED** this 29th day of July, 2020.

_____
MARK H. COHEN
United States District Judge